UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Hao Zhe Wang

Write the full name of each plaintiff.

-against-

BANK OF AMERICA CORPORATION and

SPECIALIZED LOAN SERVICING LLC

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

23 CV 4508

(Include case number if one has been assigned)

**AMENDED COMPLAINT**

Do you want a jury trial?
☑ Yes   ☐ No

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 1/9/17

I. **BASIS FOR JURISDICTION**

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐ **Federal Question**

☑ **Diversity of Citizenship**

A. **If you checked Federal Question**

Which of your federal constitutional or federal statutory rights have been violated?

_____

_____

_____

_____

B. **If you checked Diversity of Citizenship**

1. **Citizenship of the parties**

Of what State is each party a citizen?

The plaintiff, __Hao Zhe Wang_____, is a citizen of the State of
             (Plaintiff's name)

__New York_____
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
                        (Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____.

If the defendant is a corporation:

The defendant, __Bank of America Corporation__, is incorporated under the laws of the State of __Delaware_____

and has its principal place of business in the State of __North Carolina__

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Hao | Zhe | Wang |
|---|---|---|
| First Name | Middle Initial | Last Name |

PO Box 7075
Street Address

| New York | New York | 10150 |
|---|---|---|
| County, City | State | Zip Code |

6173206448
Telephone Number                Email Address (if available)

B. **Defendant Information**

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:
Bank of America Corporation
First Name / Last Name

Current Job Title (or other identifying information)
100 North Tryon Street
Current Work Address (or other address where defendant may be served)
Mecklenberg County, Charlotte    NC        28255
County, City                     State     Zip Code

Defendant 2:
SPECIALIZED LOAN SERVICING LLC
First Name / Last Name

Current Job Title (or other identifying information)
6200 S. Quebec Street, Suite 300
Current Work Address (or other address where defendant may be served)
Arapahoe County, Greenwood Village    CO    80111
County, City                          State Zip Code

Defendant 3:
First Name / Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                     State     Zip Code

Defendant 4: _____
First Name                              Last Name

_____
Current Job Title (or other identifying information)

_____
Current Work Address (or other address where defendant may be served)

_____
County, City            State            Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:   New York

Date(s) of occurrence:   2021.12-present

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

Please see attached

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Please see attached

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Please see attached

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 2023.7.28 | | _[signature]_ |
|---|---|---|
| Dated | | Plaintiff's Signature |

| Hao | Zhe | Wang |
|---|---|---|
| First Name | Middle Initial | Last Name |

PO Box 7075
Street Address

| New York | NY | 10150 |
|---|---|---|
| County, City | State | Zip Code |

6173206448
Telephone Number                                    Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes   ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

## Attachment to *Complaint*

1. Plaintiff sues Defendant, Bank of America ("Bofa"), for fraudulent misrepresentation of the progress of its underwriting process of his 2021 refinancing application of an existing mortgage Plaintiff held with Bofa; for promissory fraud; and for unfair and deceptive business practice. When Bofa experienced underwriting delays and problems in February 2022 and when interest rates started to rise across the country around the time, Plaintiff shared with the defendant his concerns and his plans to refinance the Bofa mortgage with another bank. The defendant then started to make a series of fraudulent and deceptive misrepresentations of the nature of the delays and the progress of the application that persuaded Plaintiff to stick with the defendant's product. Two months later and by late April, when interest rates climbed still higher, the defendant refused to proceed with the deal, leaving Plaintiff with nowhere else to turn by that point and to pay six thousand dollars extra per year in payments to Bofa on his existing mortgage that would last for the next 26 years, a loss to Plaintiff – and direct profit to the defendant – exceeding $194,678.

2. Plaintiff sues Bofa and Defendant SLS for breach of contract and for unfair and deceptive business practice when Bofa delegated debt collection on Plaintiff's mortgage account to SLS and stuffed unexplained fees and charges and inflated the payment amounts in the process. There were charges and fees that Plaintiff had to pay at SLS's online payment portal that were nevertheless not reflected in the billing statements, and the late fees were either unreasonable (because the defendants' delayed delivery of the billing statements was chiefly responsible for delayed payments by Plaintiff) or far exceeded the late fees as established in the fee schedules in the terms of the Bofa loan.

3. Plaintiff sues SLS for its violation of Federal Debt Collection Practices Act. Both its electronic and postal delivery of monthly statements had been characterized by delays, and instead of owning up to its mistakes, it used its own delays to assess debtors late fees – and far in excess of the original creditor's fee schedules. SLS also provided debtors no meaningful way to dispute SLS's own billing practices and fees, stonewalling disputes with answering machines and mailing addresses that do not respond to inquiries. Moreover, when the debt owed to the original creditor was disputed, SLS neglected its FDCPA duties to investigate and authenticate the debt relegated to it by its client.

4. Plaintiff sues Bofa for its violation Federal Credit Reporting Act. When Plaintiff disputed the monthly dues with the bank, it

5. In December 2021, Plaintiff was approached by the lender for one of his properties to refinance the mortgage on that property. The refinancing, which successfully closed two months later, saved Plaintiff thousands of dollars a year in interest payment.

6. That lender, which is a rival major national bank, also courted more of Plaintiff business by proposing to refinance Plaintiff's Bofa mortgage with rates that would save him six thousand dollars a year.

7. Plaintiff did not immediately take up the other lender's offer to refinance his Bofa mortgage because he had worked with a Bofa's New York-based mortgage officer, Alan Kreit, multiple times before, including in early 2019 when he obtained the current Bofa mortgage. He called Kreit to tell him that he got an offer to refinance the 2019 mortgage, and Kreit quickly drew up an offer with matching rates. In turn, Plaintiff agreed to start a refinancing application for the Bofa mortgage with Bofa on December 24, 2021.

8. On January 25, 2022, the defendant approved the refinancing application. It still asked for some documents from Plaintiff after that date, and Plaintiff continued to promptly send in the requested documents.

9. In the meanwhile, Plaintiff's other refinancing application was progressing with the rival bank. At one point, the other bank requested Plaintiff's authorization to obtain his tax transcripts from IRS. A few lines about the cost of maintaining the properties were found to be missing from the transcripts, but that bank likely saw little reason that Plaintiff underreported his cost on his tax forms, and it closed on the refinancing shortly after it received the tax transcripts.

10. In early February, Bofa also obtained Plaintiff's tax transcripts and reported a few lines of the cost of property expenses not included on transcript. An associate of Kreit's, Laura Cintorino, called Plaintiff for an explanation for the missing lines. Plaintiff said the IRS transcription was likely in error.

11. When the other bank timely closed in late February 2022 but Bofa had not gotten back in touch, Plaintiff tried repeatedly to reach Cintorino and Kreit to get an update on the closing date.

12. By early March, mortgage rates started to climb. Plaintiff started to complain to the defendant about the lack of update and planned to switch back to the other bank to refinance the Bofa mortgage. Plaintiff told Kreit his intention to switch.

13. This is when the defendant's habit of not returning Plaintiff's calls or replying to his emails in February suddenly changed into a series of frequent calls in March, in which the defendant's mortgage officers promised to extend a rate lock for free in order to beat the rate of its competitor and made many reassuring – but ultimately false and deceptive – characterizations about the progress in underwriting.

14. In one instance of the defendant's attempt to persuade Plaintiff not to pursue refinancing opportunities from the rival bank and promissory fraud, Kreit promised to Plaintiff in mid-March that he would extend the interest rate "lock" - at no cost to Plaintiff – for as long as it would take the defendant to close. The extended rate lock would mean the defendant could beat the market rate at the time by one eighth or one quarter of a percent and was economically attractive, even compelling, for Plaintiff to stay with the defendant. At the end of March when the lock expired, however, Plaintiff saw no such effort by the defendant to extend the rate lock.

15. In another instance of deception, Cintorino called Plaintiff on March 9 to say that the only thing holding up the underwriting process was the discrepancy between Plaintiff's retained copy of his tax return and the tax transcript that Plaintiff authorized the defendant to obtain and that her underwriters wanted Plaintiff to contact IRS to resolve the issue. Over the next thirty days, Plaintiff spent countless hours calling IRS' customer service line, invariably to be told that the line was too busy and that taxpayers should call back the next day. In the meanwhile, the bank continued to send Plaintiff letters in the post every few days updating him on the refinance application, saying that it will "let you know when...we'll schedule your closing date." On April 8, Plaintiff finally got hold of an IRS agent on the phone after another long day of waiting on the line. The agent told Plaintiff that his tax transcripts were not meant to be exact copies of his returns and that, instead of transcripts, a "photo static copy" of his tax returns should be requested using IRS Form 4506 to ensure completeness of the information. Plaintiff promptly reported this conversation to the bank through email and authorized it to make the request for the photo static copy. Plaintiff continued to receive communications from the defendant through mid-April, including an April 11 letter, that it was working to gather documentation but otherwise gave no specifics or any indication that it has submitted a Form 4506 as the IRS agent suggested.

16. In another mid-March call, after Plaintiff complained of the hours he was spending waiting on the line for IRS customer service, Kreit told Plaintiff that the underwriters could disregard the 2020 return and rely instead on 2019 tax return – which had less missing lines. While this did not stop Plaintiff from making daily calls to IRS in hoping of getting it to correct the transcript for his 2020 return, it did offer more reassurance to Plaintiff that it would not make sense for him to start – and pay for – a refinance application from the other bank.

17. A few days after Plaintiff received the defendant's April 11, 2022 letter, it issued another letter to inform him that it was no longer willing to refinance the existing mortgage it has with Plaintiff.

18. By this time in April, the refinancing rate offered by the rival bank was already higher than the existing rate on the Bofa mortgage. Consequently, Plaintiff was hopelessly stuck with the original Bofa mortgage and with thousands of dollars in excess interest payments to the defendant each year than he would have needed to pay if he had started the refinancing application with the rival bank by early March 2022. The defendant, by virtue of its serial deception of Plaintiff over March and April, would expect to gain an extra profit of more than $194,678 from Plaintiff's existing mortgage over the next two decades.

19. In February 2023, a Bofa representative also called Plaintiff to say that its mortgage would be handled by a dedicated loan service firm by March 1. The representative refused to explain the meaning of this change or transition or the nature of the "loan service", except to say that the terms and amount of payments would not change and the nature of the "loan service firm" would be explained in a letter from the latter firm.

20. Plaintiff did not receive any communications from the new firm, Specialized Loan Serving ("SLS"), until March 22, when he received two letters, dated March 9 and March 10 respectively, the first briefly introducing itself as the new firm handing Plaintiff's Bofa loan and a second telling Plaintiff to call a representative named Tracy at 8003066059.

21. Plaintiff called the number that same day and was greeted by a machine that described SLS as a debt collector. The automated system asked Plaintiff to verify his identity and then told him to go to SLS.net. The automated system terminated the call after giving Plaintiff the foregoing information.

22. Plaintiff proceeded to the website and registered an account but soon found himself unable to set up monthly payments and instead received a message saying "NOTICE: Your current due date is in the past. Once the payment has been credited to your account, you can come back here to setup your autopay."

23. In looking to make the "overdue" amount at the online payment portal, Plaintiff saw a mysterious $844.33 charge as well as a late fee assessment in excess of $210 and a message saying that the account had become overdue on March 16.

24. Trying to make sense of the charges, Plaintiff looked for billing statements and found only a single statement, dated March 17 and which made no mention of the $844.33 amount or the late fees but listed an equally mystifying $2,942.75 balance that was nine hundred dollars higher than what Bofa used to charge Plaintiff each month.

25. Unable to proceed otherwise to set up automatic payments, Plaintiff paid all the mysterious amounts but also wrote to SLS on the same day, first to dispute the legitimacy of the Bofa debt that SLS was collecting but also to highlight the fact that the charges and payments that SLS was collecting for the Bofa loan was much higher than the Bofa figure that Plaintiff was already disputing, even though Bofa had represented to Plaintiff that the terms and schedule of payments would not change after the debt collector came into the picture and that the charges that Plaintiff had to pay off at SLS's online payment portal did not even match the numbers in SLS's own statements.

26. SLS acknowledged the receipt of Plaintiff's dispute letter and promised to respond. The promised response never arrived, even though it continued to deduct payments from Plaintiff's checking account.

27. Calls to SLS's "customer resolution center" continued to be answered by a self-described "automated system" that directed Plaintiff to use SLS's website instead.

28. In short, Plaintiff had been unable to receive any meaningful response to his phone calls and requests in writing for clarification about the changed amounts and terms of the debt payment except a letter that confirmed SLS's receipt of Plaintiff's March 23 letter and promised a response.

4

29. In using a new debt collector, Bofa appears to have found an opportunity to profit still more from the disputed mortgage by imposing charges that were not reflected in billing statements (e.g., the $844.33 or a late fee in excess of $210 that deviated from schedule of late fees that was part of the terms of the loan) and as well as including charges in billing statements that were unreasonable (when Bofa's delegation of a new debt collector and the resultant 17-day delay in generating the March statement should be blamed for the lateness of Plaintiff's March 23 payment) and outright inexplicable (the new, $2,942.75 figure that continues to mystify Plaintiff as his written request for clarification of the number continues to be stonewalled and his calls continue to be answered by a machine that tells him to look to the website instead, which provides the correspondence address to which Plaintiff sent his written request).

30. Amid Plaintiff's dispute with the lender, Bofa's consumer credit reporting arm played the role of a henchman in enforcing Bofa's view of the dispute. When Plaintiff disagreed with the amount due, Bofa reported his loan as delinquent. Plaintiff then wrote to the credit reporting agencies to report that Plaintiff had in fact kept up payments that were rightfully due to Bofa, disputed the delinquency status as reported by Bofa and described his dispute with Bofa as one about the payment amounts. In turn, the credit report agencies transmitted Plaintiff's account of the dispute to Bofa to request it to investigate the dispute as a furnisher of information in the definition of Fair Credit Reporting Act.

31. Bofa acknowledged the receipt of the credit reporting agencies' requests for investigation in a letter to Plaintiff. In its letter, however, Bofa included a boilerplate form asking Plaintiff to take steps to document that his identity had been stolen.

32. In other words, instead of addressing the dispute at the heart of Plaintiff's request for investigation, Bofa bizarrely re-framed it as an identity theft issue, either because its agents were carelessly and negligently trained to handle only identity theft cases in FCRA disputes or perhaps because it had no intention of conducting a real investigation in Plaintiff's case. Bofa summarily reaffirmed the debt with the credit reporting agencies when Plaintiff refused to play along in its phony investigation of a made-up identity theft case.

33. The defendant's serial misrepresentations were a fraud designed to keep its mortgage customers in a macroeconomic climate of rising rates: it aimed to lure them by matching or beating refinancing offers from rivals; it then trapped them by stalling the application process, as it did to Plaintiff's application in March and April and even in February 2022, until the customers had nowhere else to turn to refinance after the rates went up.

34. These misrepresentations also amounted to unfair and deceptive business practice enjoined by New York law. Through its unfair and deceptive practice the bank was thus able to coercively keep its mortgage customers and keep their loans at excessive rates. Therefore, Plaintiff sues for judgment against the defendant for monetary damages, disgorgement and restitution of all profits and gains it obtained by the unfair and fraudulent acts alleged herein and for punitive and exemplary damages allowed by law.

35. Bofa and its debt collector and co-defendant, SLS, also engaged in unfair and deceptive business practice when they added fees and charges to customers' online payment portal that were not reflected or accounted for in the statements that the customers received from them; when they added fees that were different than the agreed-upon fee schedules; and when they imposed late fees two weeks into a billing cycle but did not generate or mail out the statement for the billing cycle until still later in the cycle.

36. For imposing late fees that were many times larger than the terms of the loan permits, Plaintiff also sues the defendants for breach of contract.

37. For SLS, these practices also are a failure of its statutory obligations FDCPA imposes on debt collectors. Its apparent failure to verify the legitimacy and amount of a debt that it has collected on behalf of Bofa after receiving a written notice of the dispute from the debtor likewise violated FDCPA. Plaintiff sues SLS for these violations.

38. Plaintiff sues Bofa for its malicious or willful failure to conduct a reasonable investigation as a furnisher of information under FCRA upon its receipt of dispute notices from the credit reporting agencies. Despite the detailed account about the nature of the dispute that Bofa received from the credit report agencies, Bofa started its investigation with a nonsensical angle of asking Plaintiff to prove an identity theft, which is proof of its total disregard of the investigation request and of Bofa's obligations under FCRA as a furnisher of information.

39. Plaintiff's credit profile was severely damaged as a result, causing him lost financial and investment opportunities as well as a great deal of emotional distress over the past year, including many sleepless nights. Plaintiff thus sues Bofa for its violation of FCRA and for monetary and emotional damages.